**Russell G. COURTNEY, Appellant,**

v.

**UNITED STATES of America, Appellee.**

No. 72–2304.

United States Court of Appeals, Ninth Circuit.

Sept. 27, 1973.

Paul M. Posner (argued), of Posner & Newman, Beverly Hills, Cal., for appellant.

John M. Newman, Jr., Asst. U. S. Atty. (argued), William D. Keller, U. S. Atty., Eric A. Nobles, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before HASTIE,* GOODWIN and WALLACE, Circuit Judges.

* The Honorable William H. Hastie, Senior United States Circuit Judge, sitting by designation.

HASTIE, Circuit Judge:

■ This proceeding, authorized by Section 2255 of Title 28, United States Code, is a collateral attack by Russell Courtney upon his conviction of obstructing justice in violation of Section 1503 of Title 18, United States Code.[1] The district court denied relief and this appeal followed.

Appellant Courtney and a co-defendant, Barry Kornhaber, were indicted for related federal offenses and were tried together. Both were charged with obstruction of justice. Appellant also was charged in other counts with certain Mann Act violations, in connection with which the obstruction of justice allegedly occurred. A jury convicted appellant on Mann Act counts and on the obstruction of justice count but acquitted Kornhaber of obstruction of justice, the only charge against him. On appeal, this court affirmed Courtney's conviction on the obstruction of justice count but set aside his Mann Act convictions. Courtney v. United States, 9 Cir., 1968, 390 F.2d 521, cert. denied 393 U.S. 857, 89 S.Ct. 98, 21 L.Ed.2d 126.

■ Courtney's principal contention is that the introduction of Kornhaber's incriminating extra-judicial statements as evidence at their joint trial violated the constitutional prohibition of Bruton v. United States, 1968, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476. Although Bruton was decided after Courtney's conviction, the rule of that case is fully retrospective in its applicability. Roberts v. Russell, 1968, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100.

The prosecution's case in chief against both Courtney and Kornhaber on the charge of obstruction of justice was established by the testimony of Loretta Hoskins, a young woman whom Courtney was alleged in other counts of the indictment to have transported in interstate commerce for the purpose of pros-

titution. Her testimony included a recital of efforts made by Courtney and Kornhaber to cause her to repudiate statements she had made to investigating officers about Courtney's role in her prostitution and then to leave town so that she would not be available as a government witness against Courtney. She also testified that Courtney had threatened her and that Kornhaber had loaned her money to get out of town.

■ At their joint trial Courtney and Kornhaber were represented by the same retained attorney and each of them testified on his own behalf.

This was a second trial. At the first trial the defendants had been represented by separately retained attorneys. After the district court ordered a new trial, some disagreement arose between Kornhaber and his attorney. It was proposed to the court that Courtney's lawyer be permitted to represent both defendants. Relying upon the acquiescence of both defendants and the assurance of counsel who had participated in the first trial that there would be no conflict of interest, the court approved the joint representation.

The prosecution introduced in evidence, as against Kornhaber alone, several pre-trial statements that he had made to investigating officers. The court charged the jury that these statements should not be considered as evidence against Courtney. But, invoking the rule of Bruton, Courtney now argues that Kornhaber's statements were damaging to him and that, in the circumstances of the trial, he was denied the opportunity to confront and cross-examine Kornhaber that the doctrine of Bruton's case guarantees him. More particularly, Courtney argues that the representation of both defendants by the same trial attorney precluded cross-examination of Kornhaber in the interest of Courtney after counsel had ques-

1. Courtney was released on parole in March 1971 after seving a little more than two years of a four year sentence. He instituted this proceeding while on parole. His parole has now expired. However, jurisdiction to grant relief under section 2255 survives. Carafas v. LaVallee, 1968, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554.

tioned him as a defendant testifying in his own behalf. We agree that counsel was in no position to undertake, in his role as Courtney's lawyer, any cross-examination or impeachment of his own witness and client Kornhaber.

For this reason, Nelson v. O'Neil, 1971, 402 U.S. 622, 91 S.Ct. 1723, 29 L. Ed.2d 222, does not help the government here. In *Nelson,* the Supreme Court held that where one defendant, whose extra-judicial incriminating statements were in evidence, had taken the stand in his own behalf, the fact that he could be cross-examined about those statements by a co-defendant's attorney prevented the co-defendant, whom the statements implicated, from successfully invoking the *Bruton* rule. But, at Nelson's trial, he and his co-defendant were represented by separate counsel, each of whom was free and obligated to act solely in the interest of his client. Here, in contrast, Courtney's lawyer could not undertake to discredit anything harmful to Courtney that had been said by Kornhaber, at or before trial, without violating his duty to serve his client Kornhaber whom he himself had called to the stand. Thus, technically, Courtney was deprived of a procedural opportunity that the *Bruton* rule normally safeguards as essential to fair trial.

It remains to consider whether Courtney was prejudiced by his inability to cross-examine Kornhaber in a situation where both defendants testified in what appears to have been a cooperative effort to cause the jury to discredit the prosecution's case as made through the testimony of Loretta Hoskins. Before considering Kornhaber's statements, we shall undertake to summarize Hoskins' testimony and Courtney's testimony, and then point out the extent of the conflict between them.

Hoskins had once been employed as a waitress by Kornhaber, a night club operator. Returning to the city after an absence during which she had lived with Courtney and worked for him as a prostitute, Hoskins, according to her own testimony, sought Kornhaber out to inquire about a typewriter she had left at the club. She also pictured herself to Kornhaber as destitute and sought a loan and a job as a waitress. In one of their conversations, Kornhaber told her that Courtney was looking for her, was disturbed about her becoming a witness against him and was ready to offer her several things if she would not appear against him. She said that she feared Courtney and was reluctant to meet him but would do so if Kornhaber also would be present. Thereafter, Kornhaber, purporting to speak for Courtney, offered her $500, a round trip ticket to Hawaii, the return of her furniture which was in Courtney's possession and the payment of any fine that might be imposed for her failure to appear as a witness.

Hoskins also testified that at a subsequent meeting with Courtney and Kornhaber she had told them that she had made statements about Courtney's wrongdoing both to the F.B.I. and before a federal grand jury. Courtney upbraided her for thus trying to harm him, threatened to tell her family about her way of life, told her how trouble had been made for another girl who had made similar charges against him and insisted that she retract her charges against him.

Thereafter, she said, frightened and confused she yielded to Courtney's insistence. More particularly, she copied from a text prepared by him and then signed a note in which she repudiated her charges against him and stated that she had made the charges falsely in a fit of anger.

Testifying in his own defense, Courtney admitted meetings with Hoskins and Kornhaber at which he had discussed with Hoskins the charges she had made against him. However, he denied knowledge that federal charges were involved. He said that he then believed that they were discussing an accusation made to state authorities charging him merely with acting as a pimp or panderer. He testified that he had chided Hoskins for making false charges and had asked her to repudiate them. He denied any coer-

cion or threats. He admitted that Hoskins had signed the requested repudiation.

Because of these testimonial admissions, the limited conflict that the jury had to resolve concerning the obstruction of justice was between Courtney's testimony that Hoskins voluntarily repudiated her charges, which he thought were limited to state offenses, and Hoskins' testimony that Courtney, aware that she had truthfully charged him with a federal offense, coerced and corruptly induced her to repudiate her charge.

This brings us to consideration of the substance of Kornhaber's statements, both before and during the trial, and their bearing upon the above defined critical conflict in testimony. Kornhaber's testimony for the defense at trial supported important parts of Courtney's testimony and did not contradict any of its essentials. He unequivocally denied that Hoskins had been coerced by him or by Courtney in his presence. He said that he did not remember any mention that Hoskins' charge involved a federal offense and that he had been unaware of that circumstance. He also did not remember any mention of another case in which a girl had made and repudiated a charge against Courtney. He was particularly helpful to Courtney in his testimony that the money he handed to Hoskins in Courtney's presence was merely his personal loan pursuant to a request she had made before Courtney entered the picture.

Kornhaber's extra-judicial statements that the government introduced into evidence contradicted each other in one significant particular. In an early statement to an investigating officer, he had denied that any exculpatory note had been discussed with or written by Hoskins. In a subsequent statement he admitted that Hoskins had written and signed such a note in his presence, but he denied that there had been any coercion. On this appeal it is strongly urged that Kornhaber's explanation of this self contradiction contained matter hurtful to Courtney upon which Kornhaber should have been cross-examined. An investigating officer testified that in changing his story Kornhaber had explained that he now realized that "he had been a dope to say what he had" and that "Mr. Courtney was making a dupe out of him and had put him in the middle of this case". However, in his testimony at the trial Kornhaber undertook to explain differently and more explicitly the thinking that had led him to change his story. He testified as follows:

> "When I originally spoke to the people at the FBI Headquarters I denied any knowledge of a note or of Mr. Courtney being there, or a note being signed, because I saw that they were going to see here a note was signed saying Mr. Courtney is innocent, or what-have-you, and then she leaves, and the same day I had lent this girl $400, and I could see where they were going to tie these things together. That's why at my first interviews there I didn't tell this to the FBI."

While Kornhaber's statement characterizing himself as a "dupe" for Courtney may well have confirmed in some small way the unfavorable impression of Courtney that Hoskins' testimony, and indeed Courtney's own testimony, must have created in the jurors' minds, Kornhaber's above quoted explanation at trial of his reasons for changing his original statement went about as far as he credibly could have gone in minimizing any damaging impact of his earlier "dupe" language upon Courtney's defense. Courtney does not suggest and we do not see how cross-examination of Kornhaber by separate counsel for Courtney could have accomplished more than did the direct examination of this manifestly friendly witness by the lawyer who represented both defendants.

We are satisfied that, in the circumstances of this case, any technical violation of the *Bruton* rule was harmless beyond reasonable doubt.

What already has been said also disposes of any question whether apart from the *Bruton* rule, Courtney's constitutional right to effective assistance of counsel has been respected. The defendants chose to harmonize their defenses and particularly to take the stand and give consistent and mutually helpful accounts of the matters in controversy. To that end, joint representation may well have been helpful. Certainly, it was not obviously prejudicial to Courtney. Having thus chosen a promising cooperative line of defense under the direction of his own lawyer representing both defendants, Courtney cannot now successfully complain that the court violated his constitutional right by permitting the joint representation.

The appellant has briefed and argued other contentions unrelated to the *Bruton* doctrine or to the representation of both defendants by the same attorney. We find no merit in any of them.

The judgment is affirmed.