**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Patricia Campbell HEARST, Defendant–Appellant.**

No. 78–3612.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 10, 1980.

Decided Oct. 17, 1980.

Rehearing Denied Jan. 15, 1981.

George C. Martinez, San Francisco, Cal., for defendant–appellant.

Sanford Svetcov, Asst. U.S. Atty., San Francisco, Cal., argued for plaintiff–appellee; Edward P. Davis, Jr., Asst. U.S. Atty., San Francisco, Cal., on brief.

Before CHOY and GOODWIN, Circuit Judges, and THOMPSON,* District Judge.

CHOY, Circuit Judge:

Hearst appeals the district court's denial, without discovery or a hearing, of her motion for "habeas corpus," 28 U.S.C. § 2255. We affirm in part and vacate in part, and remand for further proceedings.

I. *Introduction*

Hearst was arrested in September 1975 for bank robbery. Soon after, she made incriminating statements, which were captured by jail officials on the "Tobin tape," in a jailhouse interview with her friend Tobin. F. Lee Bailey and his associate J. Albert Johnson entered the case on October 2 as Hearst's counsel and prepared a defense based on a coercion theory. They did not move for a change of venue or for a continuance on the ground of pretrial publicity, choosing instead to rely on the voir dire of the prospective jurors. Their motion to suppress the Tobin tape was denied. Trial began in February 1976. Bailey put Hearst on the witness stand; she took the Fifth Amendment in the presence of the jury. Hearst was convicted on March 20. Her motions for a new trial were denied. She took an unsuccessful appeal, and certiorari was denied. 563 F.2d 1331 (9th Cir. 1977), *cert. denied*, 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978). Bailey and

---

* The Honorable Bruce R. Thompson, Senior United States District Judge for the District of Nevada, sitting by designation.

Johnson were fired, and through present counsel Hearst filed a § 2255 motion, which Judge Orrick denied without a hearing. 466 F.Supp. 1068 (N.D.Cal.1978). While the appeal from this ruling was pending, President Carter commuted Hearst's sentence.[1]

Most of the above is well known, for Hearst's case was a *cause celebre.* We now know, in addition, that during the course of the proceedings Bailey contracted to write a book about the trial, thus raising questions of potential or actual conflict of interest.

Bailey has admitted by affidavit that

In February of 1976, I had received several offers to publish a book concerning the Hearst trial. A contract was eventually signed with G. P. Putnam, however, that contract was made contingent upon Ms. Hearst agreeing not to write about her experiences for a period of eighteen months subsequent to the publication. I indicated to Putnam that I would not submit any agreement on this subject to Ms. Hearst while the matter was still being litigated and the contract thus remained contingent upon Ms. Hearst's approval.

On March 22, 1976, Hearst signed the following covenant:

March 22, 1976

Putnam/Berkley Publishing Corp.
New York, New York

Gentlemen:

I understand that F. Lee Bailey is writing a book about my trial and life story as it pertains to the trial for which he will contract with you for publication in the United States and Canada.

As an inducement for you to publish this book, I hereby agree not to publish any account of my experiences in book, magazine, or any other form, prior to 18 months from your initial (hardcover) publication of Mr. Bailey's book, and I fur-

ther agree to cooperate fully and exclusively with Mr. Bailey in his preparation and writing of the book in any manner he requires.

Very truly yours,
/s/ Patricia C. Hearst
Patricia Campbell Hearst

PCH.sm

Randolph Hearst, appellant's father, declared by affidavit that in September 1975 he discussed with Bailey the possibility of a book, and did not rule out the possibility. Mr. Hearst declared that he did not consider book rights to be part of the fee arrangement for the trial. He declared further that "after . . . trial" Johnson told him that Bailey wanted to write a book about Ms. Hearst's trial, that this would be part of the fee arrangement for the appeal, and that Ms. Hearst would have to sign a covenant not to publish anything for eighteen months after the trial. Mr. Hearst, not knowing that Bailey had negotiated or contracted during the trial to write a book, told Johnson to tell Ms. Hearst that he had no objection to the arrangement Johnson had described.

Ms. Hearst declared by affidavit that before trial Johnson told her that Bailey would write a book about her, that the book rights were part of the fee arrangement her parents had made, that she had to agree to the arrangement but was not to discuss it, and that Johnson would someday ask her to sign a paper relating to it. She further declared that on March 22, two days after her conviction, Johnson brought her the covenant and said, "Remember the paper I would be bringing you to sign one day; well this is it"; that she did not have independent counsel, feel a sense of free will, or understand the effect of the covenant; and that it was never her desire that Bailey write a book about her or the trial.[2]

---

1. Although Hearst is no longer in federal custody, this case is not moot. *Courtney v. United States,* 486 F.2d 1108 (9th Cir. 1973). The district court on remand will have the power under § 2255 to vacate Hearst's conviction, if it finds such relief appropriate.

2. Hearst alleged that Bailey's book contract called for a $70,000 advance and a total of $225,000; that the advance was paid; that Bailey had a ghostwriter write "The Trial of Patty Hearst"; and that the publisher rejected the manuscript. Hearst declared by affidavit that on August 1, 1977, Bailey wrote her that since

## II. Hearst's Contentions

Hearst makes the following contentions on appeal:

A. Her Sixth Amendment right to the assistance of counsel was violated when Bailey pursued his own interest in publication rights, rather than her interest in acquittal, by (1) failing to seek a continuance; (2) failing to seek a change of venue; (3) putting Hearst on the witness stand; (4) failing to investigate the Tobin tape issue; and (5) failing to investigate the possibility that involuntary ingestion of hallucinogens overcame Hearst's will.

B. Aside from any conflict of interest, Bailey's failure to pursue the defense based on the involuntary ingestion of hallucinogens was incompetence that violated the Sixth Amendment.

C. Aside from any conflict of interest, Bailey's failure to succeed in suppressing the Tobin tape was incompetence that violated the Sixth Amendment.

D. In any event, the Constitution forbade the introduction of the Tobin tape.

E. Because pretrial publicity made a fair trial impossible, the conviction was obtained without due process of law.

We vacate and remand for hearings under § 2255 on contentions (A)(1), (2), and (3). We affirm the district court's other rulings.

### A. Conflict of Interest

Hearst claims that Bailey's book contract created a conflict of interest that deprived her of her Sixth Amendment right to the assistance of counsel. This alleged conflict was not total, for surely the salability of Bailey's book would have been enhanced had he gained an acquittal for Hearst. Nonetheless, Hearst charges that Bailey (1) failed to seek a continuance, so public interest would not cool and competing authors would not get the jump on him; (2) failed

to seek a change of venue, because publicity would be maximized by a trial in San Francisco, a media center and the home of the Hearst family; and (3) put her on the witness stand, so her story would go on the public record and he would not be constrained by the attorney–client confidentiality rules. These decisions prejudiced Hearst, she says, because the case came to trial in the full heat of prejudicial publicity, and she was forced to plead the Fifth forty–two times in the presence of the jury.

The Government and Bailey denied that Bailey's book interest played any role in these tactical decisions, and advanced plausible reasons why he made those decisions.

The district court denied relief, on the grounds that counsel's reasonable tactical decisions could not be challenged, and that Hearst had not shown actual prejudice. 466 F.Supp. at 1075–76, 1083, 1087.

■ We hold that the district court erred in denying Hearst a hearing on these issues.[3] On remand, the district court should conduct a hearing and apply to the facts the law recently laid down by the Supreme Court in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).

### 1. The Cuyler v. Sullivan Test

In *Cuyler v. Sullivan*, a decision of which the district court did not have the benefit, the Supreme Court considered a claim that retained counsel's conflict of interest violated the client's Sixth Amendment right to the assistance of counsel. Sullivan sought federal habeas corpus relief from a state conviction, whereas Hearst's conviction was federal; Sullivan's lawyer's conflict was based on multiple representation, whereas Hearst's was based on private financial interests. These differences are immaterial. We consider the rules laid down in *Sullivan* to be directly applicable to the present case, and they should govern the case on remand.

---

the book had not been published yet, there was no need for the covenant and she could consider it null and void.

**3.** Hearst's implausible arguments that Bailey's book conflict hamstrung his investigation of

the Tobin tape issue and influenced him not to pursue a defense based on her involuntary ingestion of hallucinogens were not raised below; we will not consider them on appeal.

The *Sullivan* Court held that counsel's mere potential conflict of interest does not entitle a convict to relief. "In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Id.* at 348, 100 S. Ct. at 1718. But "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Id.*

We read *Sullivan* to define an actual, as opposed to a potential, conflict as one which in fact adversely affects the lawyer's performance. But the requirement that the petitioner show this adverse effect is not the same as the requirement of *Cooper v. Fitzharris*, 586 F.2d 1325 (9th Cir. 1978), *cert. denied*, 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 793 (1979), that the petitioner show that counsel's incompetent assistance resulted in actual prejudice. For example, overwhelming evidence of guilt might (as in *Cooper* itself) make almost impossible a showing that a relatively minor error resulted in actual prejudice. But such evidence would be completely irrelevant to an inquiry whether the same error, if caused by an actual conflict of interest, showed an adverse effect on counsel's performance.

### 2. *Requirement of a Hearing*

When a § 2255 motion is made, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . grant a prompt hearing thereon." 28 U.S.C. § 2255. The standard is essentially whether the movant has "stated a claim on which relief could be granted," *Moore v. United States*, 571 F.2d 179, 184 (3rd Cir. 1978)—or, where affidavits have been submitted, whether summary judgment for the government is proper. *See also* Fed.R. Civ.P. 12(b), 56. Under the standard established by the statute and the cases interpreting it, the district court should not have denied Hearst's conflict–based claims without a hearing.

The Ninth Circuit's rule is that "merely conclusionary statements in a § 2255 motion are not enough to require a hearing." *Wagner v. United States*, 418 F.2d 618, 621 (9th Cir. 1969). This does not, however, "mean that the moving party must detail his evidence. It means only that he must make factual allegations, as [movant] has done." *Id.*

On the other hand, in certain cases the "factual allegations" are so "palpably incredible," so "patently frivolous or false," *see Blackledge v. Allison*, 431 U.S. 63, 76, 97 S.Ct. 1621, 1632, 52 L.Ed.2d 136 (1977), that it is clear the movant is not entitled to relief or even to a hearing. "The court may appraise a petition by what is reasonably credible." *Cassidy v. United States*, 457 F.2d 813 (9th Cir.) (per curiam), *cert. denied*, 409 U.S. 1026, 93 S.Ct. 472, 34 L.Ed.2d 318 (1972).

These principles are well illustrated by *Machibroda v. United States*, 368 U.S. 487, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962). There, the movant's § 2255 motion and affidavit made detailed factual allegations, which were countered by an affidavit introduced by the Government. The district judge concluded without a hearing that the allegations were false, and denied relief. The Supreme Court vacated and remanded, saying,

> This was not a case where the issues raised by the motion were conclusively determined either by the motion itself or by the "files and records" in the trial court. The factual allegations contained in the petitioner's motion and affidavit, and put in issue by the affidavit filed with the Government's response, related primarily to purported occurrences outside the courtroom and upon which the record could, therefore, cast no real light. Nor were the circumstances alleged of a kind that the District Judge could completely resolve by drawing upon his own personal knowledge or recollection.

We cannot agree with the Government that a hearing in this case would be futile because of the apparent lack of any eye-

witnesses to the occurrences alleged, .... "... The Government's contention that his allegations are improbable and unbelievable cannot serve to deny him an opportunity to support them by evidence. On this record it is his right to be heard." [Citation.]

.    .    .    .    .

There will always be marginal cases, and this case is not far from the line. But the specific and detailed factual assertions of the petitioner, while improbable, cannot at this juncture be said to be incredible. If the allegations are true, the petitioner is clearly entitled to relief. Accordingly, we think the function of 28 U.S.C. § 2255 can be served in this case only by affording the hearing which its provisions require.

*Id.* at 494–96, 82 S.Ct. at 514.

In this case, the district court could not properly rely on the apparent regularity of the record and of Bailey's "tactical" decisions, 466 F.Supp. at 1075, 1083, to "conclusively show" that Hearst was entitled to no relief, because her motion was based on a circumstance, not appearing on the record, that allegedly affected Bailey's judgment. *See Sanders v. United States,* 373 U.S. 1, 19–20, 83 S.Ct. 1068, 1079, 10 L.Ed.2d 148 (1963) (hearing must be granted on § 2255 claim that apparently regular guilty plea was invalid because defendant was under influence of narcotics). Bailey's potential conflict of interest is virtually admitted, and Hearst has alleged an actual conflict and adverse effect in sufficient and not implausible detail.

We conclude that Hearst is entitled to a hearing on the truth of her allegations.[4]

### 3. *Discovery*

Hearst alleged that Bailey was negotiating with publishers before the trial, when certain challenged decisions were made; she offered to prove it through depositions and discovery from Bailey's publisher and its editor–in–chief.

In § 2255 cases, "A party may invoke the processes of discovery . . . if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." Rule 6 (following § 2255); *see Argo v. United States,* 473 F.2d 1315, 1317 (9th Cir.), *cert. denied,* 412 U.S. 906, 93 S.Ct. 2298, 36 L.Ed.2d 972 (1973). The district court, because of its belief that Hearst's § 2255 motion was meritless, refused to allow Hearst to take discovery under Rule 6. On remand, the district court should again consider the question of discovery.

### B. *Ingestion of Drugs–Attorney Incompetence*

█ The district court correctly found that Hearst had no possibility of demonstrating that Bailey's representation ·was incompetent to the extent that he failed to investigate fully the possibility that involuntary ingestion of hallucinogens overcame Hearst's will. 466 F.Supp. at 1086–87. The only evidence of this ingestion, besides Hearst's vague assertion that she had experienced drug–type sensations, was a double hearsay account of Donald DeFreeze's unfo-

---

4. The Supreme Court has noted that although the standards for disposing without a hearing of habeas corpus petitions by state and federal prisoners are theoretically "exactly commensurate," in practice

    a motion under § 2255 is ordinarily presented to the judge who presided at the original conviction and sentencing of the prisoner. In some cases, the judge's recollection of the events at issue may enable him summarily to dismiss a § 2255 motion, even though he could not similarly dispose of a habeas corpus petition challenging a state conviction

but presenting identical allegations. . . . To this extent, the standard may be administered in a somewhat different fashion.

*Blackledge v. Allison,* 431 U.S. 63, 74 n.4, 97 S.Ct. 1621, 1629, 52 L.Ed.2d 136 (1977).

Since Judge Orrick's decision to deny a hearing was based on his reading of the trial record, however, not on his personal recollection of the trial, the standard must be administered strictly here. Although Judge Orrick presided at Hearst's sentencing and considered the § 2255 motion which is the subject of this appeal, the

cused statement of future possibilities.[5] No psychiatric report suggested that hallucinogens had affected Hearst's behavior, and several psychiatrists told Bailey that the symptoms she reported could have been a normal reaction to light after one has been blindfolded. If this drug defense had been unsuccessfully proffered the credibility of Hearst's entire defense might have been destroyed. Bailey acted well within the scope of "reasonably competent and effective representation," *Cooper v. Fitzharris*, 586 F.2d at 1327, when he devoted his energies to other aspects of Hearst's defense. Even in the unlikely event that this decision was a mistake, there was still no constitutional dereliction. *See id.* at 1330.

### C. The Tobin Tape–Attorney Incompetence

■ As the district court found, the record demonstrates that Bailey and his co-counsel made satisfactory, if not brilliant, investigation and presentation of the facts and law that might have resulted in the suppression of the Tobin tape. 466 F.Supp. at 1078, 1079 n.17, 1086. Thus the court did not err by ruling, without a hearing, that Hearst could not demonstrate that Bailey's representation on this issue fell below the "reasonably competent and effective" level. *See* 586 F.2d at 1327.

### D. The Tobin Tape–Fourth Amendment

■ Hearst claims that the Tobin tape was the fruit of a Fourth Amendment violation and should have been suppressed. The Government provided her a full and fair opportunity to raise this issue on direct appeal; therefore, it cannot be raised on collateral review. *Tisnado v. United States*, 547 F.2d 452, 456 (9th Cir. 1976); *see Stone v. Powell*, 428 U.S. 465, 494, 96 S.Ct. 3037, 3052, 49 L.Ed.2d 1067 (1976). If the provided opportunity has been squandered due to defense counsel's incompetence or misconduct, a convict's only option on collateral review is a Sixth Amendment claim based

on inadequate assistance of counsel. *See Canary v. Bland*, 583 F.2d 887, 890 (6th Cir. 1978). We held in Part II.C, *supra*, that Hearst received adequate assistance of counsel on the Tobin tape issue.

### E. Pretrial Publicity–Due Process

Hearst claims that the huge amount of prejudicial pretrial publicity made it impossible for her to receive the fair trial guaranteed by the Fifth Amendment's Due Process Clause. Bailey did not make this claim at trial or on direct appeal, nor did he move for a continuance or change of venue to alleviate the problem; instead, he relied on the voir dire to obtain unbiased jurors. The § 2255 court held that this constituted a waiver of Hearst's due process/fair trial objection, and no "cause" was alleged or "prejudice" shown, *see Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), to justify permitting the waived objection to be litigated collaterally. 466 F.Supp. at 1073–76.

■■ In federal criminal cases, all defenses and objections based on defects in the institution of the prosecution or non-jurisdictional defects in the indictment or information must be raised before trial, or else are waived (although "the court for cause shown may grant relief from the waiver"). Fed.R.Crim.P. 12(b)(1)–(2), (f). A waived challenge of the grand jury cannot be litigated collaterally. *Davis v. United States*, 411 U.S. 233, 242, 93 S.Ct. 1577, 1582, 36 L.Ed.2d 216 (1973). Challenges of the petit jury are treated the same as challenges of the grand jury. *Shotwell Manufacturing Co. v. United States*, 371 U.S. 341, 362, 83 S.Ct. 448, 460, 9 L.Ed.2d 357 (1963). It follows that Hearst's due process/fair trial objection was waived.

Although Hearst did not explicitly identify Bailey's conflict of interest as the "cause" for this waiver, her allegations that this conflict induced Bailey to fail to move for a continuance or a change of venue

---

late Judge Oliver J. Carter presided at Hearst's trial.

**5.** DeFreeze was a leader of the Symbionese Liberation Army, the group which kidnapped Hearst.

sufficiently raised a claim of *Sykes* and Rule 12(f) "cause" before the § 2255 district court. But we note that Hearst's allegations in contentions (A)(1) and (2), that Bailey's failure to make these motions violated her Sixth Amendment rights, are substantively identical to her allegation of "cause." If she can establish actual conflict of interest and a Sixth Amendment violation, she establishes "cause"; by the same token, she cannot show "cause" without showing an actual conflict.

Once Hearst established an actual conflict of interest with adverse effect on her counsel's performance, she would be entitled to relief on contentions (A)(1) and (2) even if no prejudice to her chance of acquittal at trial appeared. Therefore, if Hearst is entitled to relief on contentions (A)(1) and (2) she will gain the relief she seeks through contention (E); yet if she is not entitled to relief on the former contentions, she could not be entitled to relief on the later contention (because she would not have established "cause"). Since the district court's decision on contentions (A)(1) and (2), which we have remanded for a hearing, will effectively moot contention (E), we see no reason to disturb the district court's decision on that issue.

## III. Attorney Discipline

### A. Standards of Conduct

Under Federal Rule of Appellate Procedure 46, a Court of Appeals can discipline any attorney who practices before it for "conduct unbecoming a member of the bar." *See In re Chandler*, 450 F.2d 813 (9th Cir. 1971). This language is not unconstitutionally vague. It refers to the legal profession's "code of behavior" and "lore," of which all attorneys are charged with knowledge and of which the American Bar Association Code of Professional Responsibility (ABA CPR) is an illustration. *In re Bithoney*, 486 F.2d 319, 324 & n.7 (1st Cir. 1973). In addition, members *pro hac vice* of the

bar of the United States District Court for the Northern District of California are charged with knowledge of the disciplinary rules of the State Bar of California, as well as those of their home jurisdiction.

### B. Bailey's Conduct

The allegations and admissions in the record of the present case raise serious questions as to whether Bailey and, to the extent of his participation, Johnson have been guilty of conduct unbecoming members of the bar.

#### 1. The Book Contract

Bailey's book contract created a potential conflict of interest; this case tests whether it ripened into an actual conflict of interest. Therefore, Bailey may have violated ABA CPR Disciplinary Rule 5–101(A), which reads:

> Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests.

The obvious reason for this rule is well expressed in ABA CPR Ethical Consideration 5–1:

> The professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of his client and free of compromising influences and loyalties. Neither his personal interests, the interests of other clients, nor the desires of third persons should be permitted to dilute his loyalty to his client.

Bailey's book contract might not fall within ABA CPR Disciplinary Rule 5–104(B), *see infra*, because the contract itself was not an acquisition *from the client* of an interest in publication rights. Nonetheless, Rule 5–104(B) recognizes the dangers inherent in simultaneous lawyering and authoring.[6] Moreover, all courts before which the

---

**6.** This recognition becomes even more explicit in Rule 1.9(d) of the Discussion Draft of the ABA *Model Rules of Professional Conduct, Re-* *printed in* 48 U.S.L.W., No. 32, at 8 (Feb. 19, 1980):

> Prior to the conclusion of representation of a client, a lawyer shall not make or negotiate

issue has been raised have disapproved the practice of attorneys arranging to benefit from the publication of their clients' stories. *See Ray v. Rose*, 491 F.2d 285, 289 (6th Cir.), *cert. denied*, 417 U.S. 936, 94 S.Ct. 2650, 41 L.Ed.2d 240 (1974); *Ray v. Rose*, 535 F.2d 966, 974 (6th Cir.), *cert. denied*, 429 U.S. 1026, 97 S.Ct. 648, 50 L.Ed.2d 629 (1976); *Wojtowicz v. United States*, 550 F.2d 786, 793 (2d Cir.), *cert. denied*, 431 U.S. 972, 97 S.Ct. 2938, 53 L.Ed.2d 1071 (1977); *People v. Corona*, 80 Cal.App.3d 684, 720–21, 727, 145 Cal.Rptr. 894, 915–16, 920 (1978); *Maxwell v. Superior Court*, 101 Cal. App.3d 736, 161 Cal.Rptr. 849, 854–56, 861 (1980) hearing granted March 20, 1980.

In light of Rule 5–101(A), Bailey's decision to enter into a book contract during the course of the trial was most unfortunate. Potential and actual conflicts of interest always bring disrepute upon the bar, the court, and the law. They do so to an even greater degree when the case is a *cause célèbre* and the attorney has the reputation of being an outstanding lawyer. Moreover, Bailey is in no position to claim that the book contract was necessary to finance his fee.

### 2. *The Covenant*

ABA CPR Disciplinary Rule 5–104(B) reads:

> Prior to conclusion of all aspects of the matter giving rise to his employment, a lawyer shall not enter into any arrangement or understanding with a client or a prospective client by which he acquires an interest in publication rights with respect to the subject matter of his employment or proposed employment.

Even though Bailey's book contract itself technically might not violate this Rule, Hearst's March 22 covenant to cooperate

. an agreement giving the lawyer literary rights to a matter arising from the representation.
The Comment to that proposed Rule reads in part:
An agreement by which a lawyer acquires literary rights concerning the subject matter of the representation involves incompatible standards for the lawyer's performance, one being effectiveness in representing the client

exclusively with Bailey and not to publish on her own was obtained pursuant to his representation and, we believe, constituted an "interest in publication rights." Although Hearst's trial had ended on March 22, Bailey's representation of Hearst had not. He continued to represent her through a motion for new trial, a second motion for new trial, sentencing, a direct appeal to this Court, a petition for rehearing en banc, a petition for certiorari, a motion to vacate a concurrent sentence, and a Rule 35 motion to reduce sentence. Thus, Bailey was apparently in violation of ABA CPR Disciplinary Rule 5–104(B) from March 22, 1976, onward.

### 3. *The Fraud on the Client*

Bailey admits the book contract; the covenant is in the record. The allegations suggesting fraud are not so well established. However, if proved, they would tend to show that Bailey and Johnson misled Randolph Hearst and appellant regarding the finality of the agreement for a book, the subject of the book, the duration of the covenant, the application of the proceeds, and appellant's obligation to sign the covenant. The allegations regarding the background, manner and timing of the presentation of the covenant to appellant for signing indicate overreaching.

If all this is true, Bailey and Johnson may have violated ABA CPR Disciplinary Rule 1–102(A)(4):

> A lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

Other Disciplinary Rules might also be involved. Attention should also be directed to California Rule of Professional Conduct 5–101:

> and the other being performance that has literary value. Even after conclusion of representation, a lawyer may make use of information about a client in an account of professional experience only to the extent permitted by Rule 1.7.
> The proposed Rule, if in effect at the time, would explicitly have prohibited Bailey's book contract.

A member of the State Bar shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless (1) the transaction and terms in which the member of the State Bar acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in manner and terms which should have reasonably been understood by the client, (2) the client is given a reasonable opportunity to seek the advice of independent counsel of the client's choice on the transaction, and (3) the client consents in writing thereto.

## C. *Disciplinary Proceedings*

We suggest that the district court, on remand, might find it advisable to issue to Bailey (and perhaps to Johnson as well) an order to show cause why he should not be disciplined, on the grounds noted above, in his capacity as a member *pro hac vice* of the bar of the United States District Court for the Northern District of California.[7]

## IV. *Conclusion*

As to Hearst's contentions that Bailey suffered from an actual conflict of interest that adversely affected his performance, in that it caused him to fail to seek a continuance, to fail to seek a change of venue, and to put Hearst on the witness stand, the district court's denial of the motion for relief is VACATED, and the case REMANDED for reconsideration of Hearst's discovery request, and for a hearing.

As to all other matters, the judgment of the district court is AFFIRMED.

---

7. We choose not, at this time, to issue to Bailey an order to show cause why he should not be disciplined by the United States Court of Appeals for the Ninth Circuit. We will await the findings made in the district court's disciplinary proceedings, and do what appears necessary thereafter.